# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | |
|---|---|
| MICHAEL E. GOLDSTON and CHARLOTTE C. GOLDSTON,<br><br>    Plaintiffs,<br>v.<br><br>SUNTRUST MORTGAGE, INC.,<br><br>    Defendant. | No. 3:12cv0804<br><br>Judge Trauger<br>Magistrate Judge Knowles<br><br>JURY DEMAND |

## AGREED FINAL JUDGMENT

As evidenced by the signatures of their respective counsel set forth below, the parties have agreed to compromise and settle all claims at issue in this action. As part of their settlement, the parties have agreed to amend the amended and restated promissory note dated November 15, 2007 at issue in this action by execution of a loan modification agreement in the form attached as **Exhibit A** hereto. Based upon the parties' agreement, the Court ORDERS as follows:

1. The Goldstons' obligations to repay the loan at issue in this action shall hereafter be governed by the terms of the loan modification agreement attached as **Exhibit A** hereto, which is enforceable according to its terms;

2. All other claims at issue in this action are hereby DISMISSED WITH PREJUDICE.

THIS IS A FINAL JUDGMENT.

_____
Honorable Aleta A. Trauger,
United States District Judge

APPROVED FOR ENTRY:

s/ Garry K. Grooms
Garry K. Grooms, #12647
STITES & HARBISON, PLLC
401 Commerce Street, Suite 800
Nashville, TN 37219
615-782-2200
Garry.grooms@stites.com
*Counsel for Defendant SunTrust Mortgage, Inc.*


s/ Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr., #12005
Paul K. Krog, #29263
LEADER, BULSO & NOLAN, PLC
414 Union Street, Suite 1740
Nashville, TN 37219
615-780-4110
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    I hereby certify that on this 14th day of June, 2013, a copy of the foregoing *Agreed Final Judgment* was filed electronically with the Clerk's office by using the CM/ECF system and served electronically and/or via hand delivery upon the parties as indicated below. Parties may also access this filing through the Court's ECF system.

    Eugene N. Bulso, Jr.
    Paul K. Krog
    LEADER, BULSO & NOLAN, PLC
    414 Union Street, Suite 1740
    Nashville, TN 37219

                                                              s/ Garry K. Grooms
                                                              Garry K. Grooms


02592N:120972:994628:1:NASHVILLE

# EXHIBIT A

RETURN RECORDED DOCUMENT TO:
SunTrust Mortgage, Inc.
Loss Mitigation, RVW 3054
1001 Semmes Avenue
Richmond, VA 23224
Prepared By: CAROLE VADEN

THE MAXIMUM PRINCIPAL INDEBTEDNESS FOR TENNESSEE RECORDING TAX PURPOSES IS $0.00.

_____ [Space Above This Line For Recording Data] _____

LOAN # 0033768631

# LOAN MODIFICATION AGREEMENT

This Loan Modification Agreement ("Agreement"), made this 31ST day of **MAY, 2013**, between **MICHAEL E GOLDSTON AND CHARLOTTE C GOLDSTON, HUSBAND AND WIFE** ("Borrower") and **SUNTRUST MORTGAGE, INC.** ("Lender"), amends and supplements (1) that certain Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated **DECEMBER 21, 2005** in the amount of **$1,878,000.00** and recorded **DECEMBER 28, 2005** in book or Libor **3783** at page(s) **934-954** of the **OFFICIAL** records of **WILLIAMSON COUNTY, TN** and (2) that certain note ("the Note"), bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at:

**3400 FLOYD ROAD
FRANKLIN TENNESSEE 37064**
(Property Address)

the real property described being set forth as follows:

SEE ATTACHED SCHEDULE "A"

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of **JUNE 15, 2013**, the amount payable under the Note and the Security Instrument (the "New Principal Balance") is U.S. **$1,600,522.51** consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of **0.27525%**, from **JUNE 15, 2013**. The interest rate Borrower will pay may change in accordance with the terms outlined in Section 3 of this Modification Agreement. Borrower promises to make monthly payments of principal and interest of U.S.**$6,961.25**, beginning on the 15TH day of **JULY, 2013**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. If on **JUNE 15, 2018** (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3. Borrower's adjustable interest rate will equal the average of interbank offered rates for three (3) month U.S. Dollar denominated deposits in the London Market ("LIBOR"), as published in the Wall Street Journal. The initial fixed interest rate will change to an adjustable interest rate on the 15TH day of **DECEMBER, 2013,** and the adjustable interest rate may change on that day every sixth month thereafter. The date on which Borrower's adjustable interest rate could change, is called a "Change Date."

   Borrower's new interest rate will become effective on each Change Date. Borrower will pay the amount of Borrower's new monthly payment beginning on the first monthly payment date after the Change Date until the amount of Borrower's monthly principal and interest payment changes again.

4. In order to calculate the monthly payments as described herein, the Principal Balance was amortized over a period of 240 months. This amortization period exceeds the remaining term of the Note as defined by the Maturity Date. The loan will not result in a zero Principal Balance at Maturity Date, as amortized, unless the loan is prepaid in full on or before Maturity Date. The Borrower promises to pay <u>in full</u> the Remaining Principal Balance (Balloon Payment), if any, and any other amounts still owed under the Note or Security Instrument by the earliest of the date of: sale or transfer of an interest in the Property, pay off of the Unpaid Principal Balance, **or the Maturity Date.**

5. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

6. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

   (a) all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and

   (b) all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

7. Borrower understands and agrees that:

   (a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

8. By this paragraph, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked, and Borrower has been advised of the amount needed to fully fund the Escrow Items.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

BY SIGNING BELOW, Borrower and Lender do each accept and agree to the terms and covenants in this Loan Modification Agreement as of the date first written above.

BORROWER

_____(Seal)
MICHAEL E GOLDSTON

By_____(SEAL)
Witness (Print Name): _____

By_____(SEAL)
Witness (Print Name): _____

State of_____§
County/City of_____§

On this the ____day of _____, ____before me, **(Notary's Name)** _____,
personally appeared **(Borrower/Title Holder's Name)** _____,
who is/are personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the above instrument and acknowledged to me that he/she/they executed the same as his/her/their voluntary act and deed.

WITNESS my hand and official seal.

Notary Signature _____ (Seal)
My Commission Expires: _____

BORROWER

_____(Seal)
CHARLOTTE C GOLDSTON

By_____(SEAL)
Witness (Print Name): _____

By_____(SEAL)
Witness (Print Name): _____

State of_____§
County/City of_____§

On this the ____day of _____, ____before me, **(Notary's Name)** _____,
personally appeared **(Borrower/Title Holder's Name)** _____,
who is/are personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the above instrument and acknowledged to me that he/she/they executed the same as his/her/their voluntary act and deed.

WITNESS my hand and official seal.

Notary Signature _____ (Seal)
My Commission Expires: _____

_____[Space Below This Line For Acknowledgement]_____

                        SUNTRUST MORTGAGE, INC.


_____ (Seal)
SUNTRUST MORTGAGE, INC.    Lender


_____
Date of Lender's Signature


(LENDER'S CORPORATE ACKNOWLEDGMENT)

COMMONWEALTH OF <u>VIRGINIA,</u>
CITY/COUNTY OF <u>RICHMOND,</u> to wit:

I, _____, a Notary Public in and for the said jurisdiction, do hereby certify that this day personally appeared before me in my said jurisdiction,

_____ Assistant Vice President of SunTrust Mortgage, Incorporated whose name is signed to the foregoing instrument and acknowledged the same before me in my said jurisdiction.

       My commission expires:
       Registration Number

GIVEN under my hand and notarial seal this the _____ day of _____, 20____.


_____
Notary Public

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae UNIFORM INSTRUMENT      Form 3179 1/01 (rev. 01/09) *(page 6 of 9)*

# SCHEDULE "A"

Being land in the third civil district of Williamson County, Tennessee, and also being the land conveyed to Turner Family Partners, L.P., as of record in Deed Book 1593, page 989, Register's Office for Williamson County, Tennessee, being generally located East of Floyd Road and North of Bailey Road and being more particularly described as follows:

Beginning at an iron rod on the Easterly right-of-way of Floyd Road, said iron rod also being the Nortwesterly corner of Ulus Ewin Osburn (Deed Book 1525, page 89),

Thence, along a curve to the left having a radius of 100.00' and an arc length of 90.88', with a chord bearing and distance of North 23° 25' 54" West for a distance of 87.79' to an iron rod on the Easterly right-of-way of Floyd Road;

Thence, with said right-of-way of Floyd Road for the following calls:

North 02° 54' 23" East for a distance of 112.25' to an iron rod;

Along a curve to the left having a radius of 575.00' and an arc length of 185.83', with a chord bearing and distance of North 06° 21' 08" West for a distance of 185.02' to an iron rod;

North 15° 36' 38" West for a distance of 193.54' to an iron rod;

Along a curve to the right having a radius of 1430.00' and an arc length of 725.33', with a chord bearing and distance of North 01° 04' 47" West for a distance of 717.58' to an iron rod;

North 13° 27' 04" East for a distance of 179.21' to an iron rod;

Along a curve to the left having a radius of 250.00' and an arc length of 170.11', with a chord bearing and distance of North 06° 02' 29" West for a distance of 166.84' to an iron rod;

North 25° 32' 03" West for a distance of 78.32' to an iron rod;

Along a curve to the right having a radius of 95.00' and an arc length of 154.81', with a chord bearing and distance of North 21° 08' 57" East for a distance of 138.24' to an iron rod;

North 67° 49' 56" East for a distance of 75.36' to an iron rod;

Along a curve to the left having a radius of 361.59' and an arc length of 376.73', with a chord bearing and distance of North 37° 59' 03" East for a distance of 359.92' to an iron rod;

Along a curve to the left having a radius of 268.26' and an arc length of 195.55', with a chord bearing and distance of North 13° 41' 05" West for a distance of 191.25' to an iron rod;

North 35° 32' 26" West for a distance of 84.88' to an iron rod;

Along a curve to the right having a radius of 1196.72' and an arc length of 147.02', with a chord bearing and distance of North 32° 01' 15" West for a distance of 146.93' to an iron rod;

Along a curve to the left having a radius of 300.00' and an arc length of 173.85', with a chord bearing and distance of North 45° 06' 10" West for a distance of 171.43' to an iron rod;

North 61° 42' 15" West for a distance of 160.58' to an iron rod, said rod being the Southwesterly corner of Albert E. & Ruby J. Jones (Deed Book 2723, page 298);

Thence, with the Southerly line of said Jones and Rhodes Living Trust (Deed Book 1583, page 630) for the following calls:

South 85° 46' 10" East for a distance of 2206.65' to a fence post;
South 85° 14' 48" East for a distance of 169.24' to a fence post;
South 85° 01' 42" East for a distance of 106.02' to a fence post;
South 78° 07' 07" East for a distance of 22.37' to a fence post;
South 85° 41' 19" East for a distance of 378.48' to a fence post;
South 85° 15' 29" East for a distance of 288.87' to an iron rod (new);

Thence, on a new severance line for the next five calls:

South 05° 25' 23" West for a distance of 570.56' to an iron rod (new);
South 43° 34' 26" West for a distance of 1478.87' to an iron rod (new);
South 25° 49' 31" East for a distance of 345.19' to an iron rod (new);
South 03° 45' 29" West for a distance of 647.11' to an iron rod (new);
North 86° 14' 31" West for a distance of 248.40' to an iron rod, said iron rod being the Northwesterly corner of the aforementioned Osburn;

Thence, with the Northerly line of Osburn, North 86° 14' 31" West for a distance of 1733.57' to the point of beginning and containing 146.97 acres more or less according to a survey by Land Design Survey, Inc. dated January 13, 2005.

EXPRESSLY INCLUDED IN THE ABOVE-DESCRIBED PROPERTY IS 5.51 ACRES, WHICH HAD PREVIOUSLY BEEN DIVIDED OUT, BUT HAS NOW BEEN COMBINED IN, DECRIBED AS FOLLOWS:

A tract of land in the 3rd Civil District of Williamson County, Tennessee, being a part of the land conveyed to Turner Family Partners, L.P. by deed recorded in Book 1593, page 989, Register's Office for Williamson County, Tennessee, and being a part of Parcel 3 on Tax Map 103 and being more particularly described as follows:

Beginning at the Southwest corner of the herein described tract, to reach the Point of Beginning start at an iron rod on the Easterly right-of-way of Floyd Road, being the Northwesterly corner of Parcel 2 on Tax Map 103 owned by Ulus Ewin Osburn (Deed Book 1525, page 89). Thence, go North 41° 00' East 460' to the Point of Beginning;

Thence,

1. With a line generally parallel to Floyd Road, North 08° 15' East, 800.00' to a point; thence,

2. South 81° 45' East, 300.00' to a point; thence,

3. South 8° 15' West, 800.00' to a point; thence,

4. North 81° 45' West, 300.00 feet to the Point of Beginning and containing 240,000 square feet or 5.51 acres.

Running with the above-described tracts is a 50 foot wide ingress-egress and utility easement, the center line being more particularly described as follows:

Beginning at a point on the Easterly right-of-way line of Floyd Road in the center of an existing gravel drive. Said point being 1695.19 feet more or less from the iron rod at starting point described above as measured along the Easterly right-of-way of Floyd Road with its meanders; thence,

1. With the center of 50 foot easement and the center of existing gravel drive South 75° 18' East, 156.00' to the beginning of a curve; thence,

2. Continuing with the center of existing drive with said curve with a radius of 172.08' to the left Northeasterly a distance of 106.47' and having a chord bearing and distance of North 86° 59' East, 104.778'; thence,

3. Continuing with the center of gravel drive North 69° 15' East, 112.00' to the beginning of a curve; thence,

4. With said curve with a radius of 156.08' to the right Northeasterly a distance of 87.62' and having a chord bearing and distance of North 85° 20' East, 86.477'; thence,

5. South 78° 35' East, 435' to the beginning of a curve; thence,

6. With said curve to the right radius 180.69' Southeasterly a distance of 363.46' and having a chord bearing and distance of South 20° 58' East, 305.211'; thence,

7. South 36° 40' West, 343.98' to a point in the North line of 5.51 acre tract as described above. Said point being North 81° 45' West, 71.45' from the Northeasterly corner of 5.51 acre tract as measured along the North line of said tract.